Case number 25-1668 from the Eastern District of Missouri, Lindell Briscoe et al. v. St. Louis County et al. Mr. Schock. May it please the court, Judge Benton, Judge Smith, Judge Erickson, Counsel, my name is B.V. Schock, I represent Lindell Briscoe, Brittany Shemley and their five children. Your Honor, a police officer was driving in a small subdivision, and he saw a bag that he thought was suspicious in the street next to the curb. And he got out of his car, and he picked it up, and he looked at it, and he was able to determine that it was heroin. And he said, aha, I'm going to the warrant office. And he went to the warrant office in St. Louis County and he said, I've got them, the people that live there, there's a bag of heroin in the street right in front of their house. The prosecutor would say, do you have any other connection to the house? That would be the question. Your Honor, I have a graphic today. Here we go, Counsel, as I showed you earlier. There's the blue dot from the Find My app. I'm holding up my little AirPods here, which are... Now this, what you're holding up is not on the record, correct? Oh yes, this is just for the demonstration to the court. Yeah, I understand. Demonstrate. Okay, yeah, go ahead. There's the blue dot in the house. If the police officer said to the warrant, to the prosecutor in the warrant office, oh, I have a blue dot, it's right in the house. Let's go, where do I sign, off we go to the races. But here, imagine a street, it's out in the street, that's all they have. Your Honor, that is where this case lives and dies. If it's enough to leave it in the street... Do we know what was really shown or what was really said, and you're nice to quote regularly what the search warrant says, but do we know what was really said about the Find My app, except what's here that you quote that was in the warrant? No, sir, but we do know what Mr. Persich did not say. He didn't say, I took a screenshot, so maybe if you have teenage friends, they can show you more how to do these things. But an iPhone with pressure on either side of the phone produces what's called a screenshot. It's a photo that's preserved. The Find My application produces a map, and there's a little blue dot wherever the AirPods are, and that map then can be, with a press of the buttons on either side, created, and then the judge who looked at the warrant application would say, ah, there's the blue dot. Hey, sir. But the blue dot doesn't actually show it's in the residence or not in the residence. I mean, when I look at my Find Me app, it just says, like, with you, you know, or it's got a little blue dot at the address for my house or at the courthouse. I'm saying, okay, now it's someplace in the courthouse. You know, and do you have any evidence in this record that says that in this particular case that this dot was on the street as opposed to in the house? Your Honor, all I have is the fact that Officer Persich did not take a screenshot, which I think any reasonable officer would have taken, that would have showed it in the house. Where I think there's a little question is, let's say the possibility that the blue dot is not accurate, and that's true. It's generally accepted. I acknowledge that by the system, that the blue dot can be used in an investigation. But if it was perchance that the blue dot's error went from the street into the house, I guess we would lose the case. But there's no evidence of that. All right, we'll have to ask him that on his deposition. And the follow-up question, which the jury will analyze, is, well, why didn't you take a screenshot and show it to the judge? But I don't know. I hate to say this, but I'm looking for my phone on my Find Me app right now, and as I look at it, all it's got is a great big circle that circles this building and the street in front of it. And then the, I guess, no, you're right. If I hit on it, there's a blue dot inside the building. Well, of course, we're here in a building with people who have lots of iPhones, and it's a many-story building. And it really, when we played with it at our house, and I encourage you to have your grandchildren help you with this, it's pretty darn good in a subdivision. I mean, it really works pretty well. But all the magistrate was told was, as of this writing, information gleaned from Apple's Find My application revealed the Stolden Apple AirPods were still at 1022 Wylan, I believe it is, court. Correct. Now, he says it in paragraph 6, and he says it in paragraph 16. One is at the residence. One is still at 122 or 1022. Now, we suggest to the court that there's a strategic ambiguity in the word at, at the residence, still at. It doesn't say in. Now, would the magistrate, in this case an associate circuit judge in St. Louis County, hear at and think, well, it probably means in, probably would. But he didn't say in. He strategically said at. Let me talk about the bootstrapping issue that comes from that and leads to the Franks analysis. Mr. Persich writes in his affidavit that the criminals, I guess the unfound criminals, and I finally figured out the count last night. There are six at the start. There are four in the car that get caught. There are two other automobiles. The other two guys drove the cars away. I think that's probably what happened. And there's no discussion of that. But since I only figured it out last night, I'm not asking Officer Persich to figure it out on the spot. That would be unfair. But this idea that the other criminals reside at or frequent the home is only bootstrapped from the dot. So the strength of the dot location determines this statement. And I suggest, Your Honor, that that is far beyond Davis versus Little Rock, your case, Judge Benton. Then we go to the ammo. The description of the guns and ammo, which is not in a numbered paragraph. It's right at the beginning. It's the second paragraph in bold. Guns and ammo, super scary. They had no evidence of that. They had evidence that the horrible criminals used a gun that had something called a drum on it, which has a lot of bullets. That's what a drum is. I mean, these characters who did this crime are very bad, scary, horrible people. And I'm not, I mean, we're not going to assert that there's a question about whether they're dangerous. The question is you have to show they were there. They have to show some connection with the residents. That's where the case lives and dies. So my argument here is that the Frank's analysis, when we take away the offending paragraphs at the residents instead of in the residents, which I think they weren't at the residents, strategic ambiguity, we take away the frequent or reside at. We take away the ammo, the guns and ammo, scary weapons paragraph, which is obviously written to sort of create an emotional reaction. Take that away, which is how the Frank's analysis works. They do contribute to probable cause. Then there is no probable cause. Now, if I may, I'd like to turn to my future topics, if there are no questions on that one. Let me talk about this issue of the county, or excuse me, the decision to use SWAT. Now, the case law says the decision to use SWAT is not firmly established as being actionable. I hope this case changes that. Y'all can do that. I want to talk about Webb, which says that the county can be liable. I think the district court, respectfully to the district court, quoted the Jackson case instead of the more recent cases that say that even if there's immunity for officer purchase, for usage for using SWAT, the county can still be liable if there is an underlying constitutional violation, which we believe there is. It has to be the result of a policy or custom, correct? Yes. Okay. What do you allege is the policy and custom? Do you allege enough of a policy and custom? Sure. We laid it out in our opening brief. We laid it out in the complaint. And then we got a, it's not in the record, we got a nice whistleblower who showed up with the policies. There's a footnote. We have the policy now. It's not, I mean, it's their policy to use SWAT in every single one. Counsel, is that in the record? Your Honor, it is not because we didn't have the information at the time. So we allege on inference. Now, we thought it was true. And as I say, we didn't have it at the time. So all we could do is allege it. Now, under Murphy. Were you attempting to supplement the record with that information? I did not, Your Honor. I put in a footnote in the brief. I guess that's as close as a supplement as I have, sir. But. Well, that's just telling us you said that you have information. It doesn't give us what the information actually is. Oh, well, I think the footnote says that it is their policy. We have a copy of the policy. And I'll be happy to submit it to the court after the hearing, if I may. May I do that, Your Honor? Just send you a copy of the policy? The court will tell you that after oral argument. Great. Proceed. But our point is we do allege it on inference. And this goes to this Murphy versus Schmidt case, which recently this court held, that when the information is in the hands of the other party, how are we supposed to get it? This goes to the Sunshine Act issue in the case. We asked for all their policies and everything five or six times. They spent months and months stonewalling us. Finally, we gave up and filed the case. Did you file a case in state court, counsel? I'm sorry? Did you file a Sunshine Act case in state court? No, sir. Okay, proceed. But our point is if they stonewall this to deny us the policy, and then they're going to hide behind the, oh, you don't have the policy, that's a violation of the Sunshine Act that's rewarded. That doesn't make sense. Let's step back to the Franks violation for just a moment. Sure. I want to hear your best argument that the statement that you believe is false, that that statement, what's the best argument that it was knowingly, intentionally, or recklessly made? Because ultimately just being wrong isn't enough to get you there. Right. Sure. So we have the dot. You have the dot. Yes. Okay. Then we have that there was no evidence that the people, the bad criminals who had not been caught resided at or frequent in the house. There's just no evidence of that because our clients are here, and they're a nice middle-class family, and they've told us there aren't any. So we alleged that we made a reasonable investigation in our case. And then the ammo, sir, they didn't have any ammo in their house. And so he says there's ammo in the house. And what he's really saying is because the dot shows that they're there and the criminals had guns, they must have them in the house. And so the argument follows that it's at least reckless for him to say, yeah, it's somewhere on that property, and you haven't told us exactly where, that the presence of the stolen iPods, earbuds, whatever they are. Let me give one more sentence here, and then I'll step down and save my time if I may. The sentence is, I'm sorry, sir, did I finish answering your question? Go ahead. If it's every single use of SWAT has to be justified, and it's their policy to do it every time, it has to be a violation. Because if you're doing it every time, you're not justifying it every time. I'll thank you if I may reserve my time. Proceed. Mr. Pratt. Good morning, Your Honors. Lawrence Pratt for the appellees, St. Louis County, and Detective Persich. May it please the Court. Your Honor, as a preliminary matter, this may not be the appropriate procedure, but I feel that I must object to appellant's placard with the blue dots. That objection will be taken with the case, Counsel. Proceed with your argument. Thank you. Specifically, there is nothing in the record that Detective Persich knew anything about a blue dot. What this case hinges on is what Detective Persich knew or could reasonably infer at the time he filed the affidavit and the request for the warrant. Not a hyper-technical, after-the-fact, evidentiary examination with 20-20 hindsight that the Supreme Court has already said is impermissible. Under the Fourth Amendment, to get a search warrant, you must have probable cause. But the probable cause only has to be supported by the probability or substantial chance of evidence of a crime being present, not the actual location of evidence. That's a trial standard, not a probable cause standard. The Supreme Court has also held that the Fourth Amendment allows for reasonable inferences as well to support probable cause in applying for a warrant. Again, they don't have to be already established facts. If it's reasonable for a police detective with 11 years of experience investigating violent crimes to infer that a suspect would have stolen property either in his possession or be at the same place, that has to be a reasonable conclusion. Now, let's take a look at what Detective Persich actually knew. He knew that there was a carjacking, that the perpetrators were heavily armed, one had some type of handgun with a drum magazine on it, and that they had employed force to steal this car and everything in it from the victims. We know that Detective Persich knew that at least one of these violent suspects was still at large. We knew that Detective Persich, with the help of a witness, this is of course not Detective Persich's Find My app, and the witnesses operating it, we knew that the Find My app indicated that the air pods that were stolen property, stolen at the same time as the car, were located at 1022 Weiland. Finally, we knew that the last time any of these three vehicles involved, the stolen vehicle and the other two vehicles, were caught on CCTV, they were seen on South Florissant Avenue, headed towards Woodward. Well, does it say headed towards in the application? It does, your honor. It does say headed towards? I believe that it does, your honor. Paragraph 16 doesn't. It says the address is located a short distance away, several tenths of a mile. But go ahead and tell me if it does say they were seen going that way. In paragraph 15, it does say northbound. I'm sorry. Yes. It does say northbound. I would direct the paragraph. No, no. It does say northbound at the end there. Okay, proceed. It is north. It is north. The address 1022 Weiland is north.  Thank you, your honor. No. And this intersection is near 1022 Weiland. This application doesn't balance on one factor. There are more than one basis and reasonable inferences. The problem with the way that the appellants frame these issues are they have taken the analysis from Maryland and from Graham v. Connor and flipped it around backwards. And now they are attempting to use that analysis to bootstrap into a Franks hearing, Franks v. Delaware, when in fact Franks is completely irrelevant to this situation. Well, it can't be irrelevant, counsel. But tell me how you think it's irrelevant. Your honor. I think irrelevancy is a low bar. But proceed. Tell me. Your honor, as I'm sure the court knows, Franks v. Delaware requires that in order for there to be an evidentiary hearing attacking the probable cause of an affidavit, that it is the defendant, in this case the appellants, have to make a substantial preliminary showing that there were misstatements in the affidavit. That these misstatements were made knowingly. They can be omissions. You'll agree. They can be omissions.  But they must be made knowingly or with a reckless disregard for the truth. There is nothing that appellants have been able to show that was a misstatement. There has been a lot of conversation about the after the fact location of AirPods. Whether you accept that as true or not isn't relevant because in any event, they're still at 1022 Wyland. Yeah, I think the argument that they're really advancing is this. And that is that there's a statement made about the locations in the Find Me app. That the statement that is made is not full, complete, and does not explain exactly where the device was located on the Find Me app. And third, that clearly they had the app in hand and it should have showed them this and therefore it was at least reckless. It might even be knowingly or intentionally, right? I think that's what they're arguing. And the question is, do they need to show some sort of evidence as to what it was that the officer saw? And if so, how are they able to do that? Your Honor, to answer your question, you put your finger on the problem. Now we're having an evidentiary hearing to determine whether there should be an evidentiary hearing. When Franks itself talks about affidavits are valid on their face unless you've got some reason to doubt the veracity. Not completeness, not accuracy, veracity. And I think it's helpful that we consider the underlying facts that the court was looking at in the Franks case. In the Franks case, the police officer that executed the affidavit made specific representations that he talked to two separate people. And that these two separate people told him specific things about the suspect when in fact he had never spoken to either of these people about anything. That is knowing, Your Honor. Nothing in the record that was before either Judge Julian or this court illustrates anything more than Detective Persich may have been mistaken. But even that's a hard stretch because a lot of what appellants cite to are things either learned after the fact or absolutely conclusory. And one must question their materiality as well. This takes us next to the use of the tactical operations team in this case. Appellants seem to put forth the argument that the use of the tactical operations team is per se excessive force. Yet provide no support whatsoever for that conclusion. The important thing about the tactical operations unit and the execution, let me say, the execution. That would support their allegation about the indiscriminate use of SWAT teams and warrant service. Do you know what that document is and have you been supplied with a copy of it? I have no idea what they are talking about nor have I been supplied or anyone in my office been supplied with this document. Do you know if there is a document in the possession of the police that is a policy with this type of directive? Your Honor, I have no knowledge of any document that fits the description of what appellants have described here today. And would tend to think that that not only doesn't exist but isn't a policy as it is not very practical. Counsel, do you know the status of their Sunshine Act request? That's independent of their lawsuit and everything else, I bet. What's the status of their Sunshine Act request? I don't know, Your Honor. That is a separate state. Well, no, it's an allegation in this case, right? Yes, it is. Yes, Your Honor. Correct, so you don't know the status of it and it's an allegation in this case is what you're telling us, right? I don't know the current status. I know that St. Louis County responded to it. I know that Plaintiff's Counsel has taken issue with the response. But to your knowledge... We are standing on the response to my knowledge. To your knowledge, no lawsuit based on your response? Not in state court, Your Honor. Other than this court. Other than is in this case. That is correct, Your Honor. Thank you, Your Honor. And on page 10 of the reply brief, the appellees noted that this, all it says is, Appellants are now in possession of a document showing it is the official policy of St. Louis County to execute all search warrants with SWAT. When you saw that, did you make any inquiry at all? Because you say that you know of no record that actually says that. That is correct. I would. I'm sorry, Your Honor. Did that cause you to do anything? Your Honor, that would cause me to wonder why appellants have not provided this alleged document. It is easier for me, speaking for myself, Your Honor, it is easier for me to look at an identified document and determine whether it is what appellants purported to be or not, than to go on a wild goose chase. And there's nothing identifying the policy by name or number or any other way? Nothing in the record or that's been cited by appellant that I have seen, Your Honor. Thank you. Your Honor, I'm running short of time, so I would ask the court to affirm the district court's judgment as regards to all the issues in this case. The detention clearly authorized by Michigan v. Summers. The Monell case, if you can't prove a violation, even one, it is hard to establish that there is a custom and practice, let alone a policy. With regard to qualified immunity, there's no violation. If there's no civil rights violation, then Detective Persich can't be stripped of qualified immunity. He gets that, and then it could be stripped if you've proven what you need to, or at least alleged it. Thank you, Your Honor. Thank you for the answer. Mr. Schock, back to you. Your Honor, my good friend, Mr. Pratt, who I've known for many years, and we've had cases together, his first statement was that there was no evidence that Mr. Persich knew of the blue dot. And I respectfully suggest to the court that the whole affidavit is about using find my, which is what the blue dot is. An interesting issue is this car issue, which the court seems interested in. Cars were northbound toward the area of Weiland Court, true. There's nothing in the affidavit that there were cars there, so if they drove there, maybe they had a Confederate come and take the car away, but there's no discussion that there were cars there, and the place had been under surveillance, and the timing is not totally clear. Your Honor, in a motion to dismiss, it's a little different than a summary judgment or something. That's why we didn't really supplement the record. You're supposed to look at just what the allegations in the complaint are. I'd like to conclude with the Zorich case, which is an Eastern District of Missouri case against St. Louis County about a SWAT team raid in which the district court found that using SWAT about a troublesome dog was not justified. So St. Louis County has had a little experience with the problem we face here, and I just thought I would draw that to the court's attention. If the court doesn't have any more questions, we'd ask that this court reverse the district court and let us carry on with this case, which we think will be enlightening to the community. Thank you, both counsel, for the argument. Case number 25-1668 is submitted for decision by the court, and counsel are excused.